**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

FRANK DAHLSTEN,

        Plaintiff,

vs.

DAVID LEE, Individually and in his
official capacity as the mayor of the City
of Dakota City, and THE CITY OF
DAKOTA CITY,

        Defendants.

No. C06-3087-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

---

**TABLE OF CONTENTS**

*I.* **INTRODUCTION AND BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    *A.* **Procedural Background** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    *B.* **Factual Background** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*II.* **LEGAL ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    *A.* **Standards For Summary Judgment** . . . . . . . . . . . . . . . . . . . . . . . . 17
    *B.* **Plaintiff's Equal Protection Claim** . . . . . . . . . . . . . . . . . . . . . . . 21
        *1.* **Elements of the claim** . . . . . . . . . . . . . . . . . . . . . . . . . . 21
        *2.* **Was Dahlsten "similarly situated" to others?** . . . . . . . . . . . 23
            *a.* **The Brad Strutzenberg property** . . . . . . . . . . . . . . . 24
            *b.* **The Ron Faltinson property** . . . . . . . . . . . . . . . . . . 25
            *c.* **The David Lee property** . . . . . . . . . . . . . . . . . . . . 25
    *C.* **Plaintiff's State Law Claims** . . . . . . . . . . . . . . . . . . . . . . . . . . 26
        *1.* **Public accommodation claim** . . . . . . . . . . . . . . . . . . . . . 26
        *2.* **Retaliation claim** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*III.* **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

# I. INTRODUCTION AND BACKGROUND

## A. Procedural Background

On December 15, 2006, plaintiff Frank Dahlsten filed a complaint in this court against David Lee, individually and in his official capacity as the major of the City of Dakota City and the City of Dakota City. This lawsuit arises from the denial of the Dakota City Council to permit plaintiff Dahlsten and his family to keep the family's pet Vietnamese pot-bellied pig, Sid, at their home. In his complaint, plaintiff Dahlsten alleges that defendants violated plaintiff's rights under the Equal Protection Clause and the Constitution of the State of Iowa by denying him and his family the same rights enjoyed by non-minority citizens to have agricultural animals as pets. Plaintiff Dahlsten also alleges that defendants violated the Iowa Civil Rights Act, Iowa Code Ch. 216, by not allowing his family to keep an agricultural animal as a family pet. Finally, plaintiff Dahlsten alleges that defendants violated the Iowa Civil Rights Act by retaliating against him for asserting his rights.

Defendants have filed a Motion for Summary Judgment on plaintiff Dahlsten's claims against them. First, in their motion, defendants assert that plaintiff Dahlsten's § 1983 claims fail as a matter of law. Second, regarding plaintiff Dahlsten's § 1983 claims against David Lee, defendants contend that defendant Lee is entitled to qualified immunity. Third, concerning plaintiff Dahlsten's § 1983 claims against defendant Dakota City, defendants contend that these claims fail because there is no valid underlying constitutional claim or, in the alternative, plaintiff Dahlsten's claims fail because he cannot show that there was a pattern or practice underlying the alleged violation. Finally, defendants contend that plaintiff Dahlsten's state law claims under the Iowa Civil Rights Act fail as a matter of law. Plaintiff has filed a timely response to defendants' Motion For Summary Judgment.

Before turning to a legal analysis of defendants' Motion for Summary Judgment, the court must first identify the standards for disposition of a motion for summary judgment, as well as the undisputed factual background of this case.

## B. Factual Background

The summary judgment record reveals that the following facts are undisputed.

Plaintiff Frank Dahlsten ("Dahlsten") is a resident of Dakota City, Iowa. The address of plaintiff Dahlsten's home is zoned residential. Defendant Lee is a resident of Dakota City, Iowa, and, at all times relevant, was the Mayor of Dakota City. Defendant the City of Dakota City is a government subdivision of the State of Iowa organized under Iowa State law.

In September of 1973, Dakota City passed its first zoning ordinance, the City of Dakota City Zoning Ordinance ("the Zoning Ordinance"). The Zoning Ordinance sets out the following six possible zoning classifications for land in Dakota City: (1) Class "A" residential districts; (2) Class "B" multiple family residential districts; (3) Class "R" retail business districts; (4) Class "C" commercial districts; (5) Class "D" commercial and light industrial districts; and, (6) Class "E" heavy industrial districts. A map attached to the Zoning Ordinance sets out the zoning areas within Dakota City.

The following uses of land are permitted in all Class "A" residential districts:

A. One-or two-family dwelling units.
B. Single family detached dwellings, provided that all new single-family detached dwellings for which building permits have been issued on or after December, 1994, the minimum dimension of the main body of the dwelling unit shall not be less than twenty (20) feet.
C. Churches and places of worship and parochial schools.
D. Public schools, public libraries, parks and playgrounds.

E.  Greenhouses and customary agricultural operations, but no livestock or fowl are to be raised in the district.

F.  Small home operations, provided there are no signs or other evidence of such use other than a small announcement or professional sign not over two (2) square feet in size.

G.  Other customary accessory uses and buildings, provided such uses are incidental to the principal use and do not include any activity conducted as a business.

H.  Fraternity, sorority and lodge houses.

Dakota City Zoning Ordinance § 165.07, Plaintiff's App. at 019.

Under the Zoning Ordinance, the following uses of land are permitted in all Class "B" multiple family residential districts:

A.  All uses permitted in Class A Residential Districts, subject to all the restrictions specified in Class A Districts.

B.  Multiple-family dwelling units.

C.  Boarding and lodging houses.

D.  Hospitals, day nurseries, nursing and convalescent homes and clinics.

Dakota City Zoning Ordinance § 165.08, Plaintiff's App. at 020. In the next higher use classification, Class "R" retail business districts, the following uses of land are permitted:

1.  Any use permitted in a Class A or Class B Residential District.

2.  Bakeries.

3.  Banks.

4.  Barber shops or beauty parlors.

5.  Bus stations.

6.  Electrical and shoe repair shops.

7.  Heating, plumbing and tinsmithing, provided the display, service and storage of all products and items are conducted within a building.

8.  Hotels.

4

9.    Interior decorating shops.

10.    Messenger or telegraph service station.

11.    Printing shop.

12.    Professional and business offices.

13.    Photographic gallery.

14.    Public garage, provided the display, repair, storage and equipping of both new and used cars and vehicles are conducted within a building.

15.    Restaurants.

16.    Sales and service of farm implements, provided the display, service and storage of same are conducted within a building.

17.    Service establishments only when totally enclosed within a building and which are not objectionable due to emission of odor, smoke, dust, gas or noise.

18.    Taverns.

19.    Theaters.

20.    Laundry cleaning establishments.

21.    Conduct of retail business entirely within a building.

Dakota City Zoning Ordinance § 165.09, Plaintiff's App. at 021.

The following uses of land are permitted in all Class "C" commercial districts:

1.    Any use permitted in the "R" District, except taverns and hotels.

2.    Filling stations.

3.    Hospitals and clinics for animals, but not open kennels or yards where animals are confined or exercised.

4.    Milk collecting depots.

5.    Motels and tourist courts.

6.    Public garage, provided the repair, storage and equipping of both new and used cars and vehicles are conducted within a building.  However, the display for sale purposes of new and used cars and vehicles need not be conducted within a building.

7.    Sales and service of farm implements, provided the repair, storage and equipping of same are conducted

within a building, however, the display for sale
purposes of new and used farm implements need not be
conducted within a building.

8. Advertising signs.

Dakota City Zoning Ordinance § 165.10, Plaintiff's App. at 021-022. The next higher use

classification is Class "D" commercial and light industrial districts, in which the following

uses of land are permitted:

1. Any use permitted in the "C" District.
2. Amusement enterprises such as dance halls and skating
   rinks.
3. Taverns.
4. Freight and passenger stations and grounds.
5. Hotels.
6. Manufacture or assembly of tools, dies, machinery,
   hardware products or sheet metal products.
7. Bottling plants.
8. Fuel and building materials, but not including junk
   yards.
9. Ice cream and cheese factories and creameries.
10. Truck terminals.
11. Used car sales or storage lot and implement sales and
    storage lots.
12. Warehouses.
13. Wholesale establishments.
14. Mobile homes.
15. Mobile home parks.
16. Any other commercial enterprise which is not noxious
    or offensive due to emission of odor, gas, dust, smoke
    or noise, and which will not substantially or
    permanently injure the appropriate use of neighboring
    property, provided that all raw materials and equipment
    utilized in such enterprise are maintained within an
    enclosed structure, except that the finished products of
    such enterprise may be stored or displayed outside of
    any structure.

Dakota City Zoning Ordinance § 165.11, Plaintiff's App. at 022-023.

The final and highest use classification is Class "E" heavy industrial districts, in which the following uses of land are permitted:

1.    Any use permitted in the "D" District.

2.    Storage of junk or non-operable motor vehicles, but only within a painted tight fence or masonry wall not less than eight (8) feet in height.

3.    Any heavy industrial or manufacturing use, provided that any use that would be objectionable by reason of dust, gas, smoke, noise, fumes, odor, vibrations, soot or explosion requires a special use permit. Included among these uses are the following: cement, lime, gypsum or plaster of paris manufacture; manufacture or storage of explosives; fertilizer or glue manufacture; garbage, offal or dead animal reduction or dumping; fat rendering or distillation of bones; petroleum refining, smelting of tin, copper, zinc or iron ores; stockyards or slaughter of animals. All such objectionable uses are subject to review by the Board of Adjustment and may be permitted if approved by the Board and subject to the securing of a special use permit therefor and to such conditions, restrictions and safeguards as may be deemed necessary for the purpose of protecting the health, safety, morals or general welfare of the community.

Dakota City Zoning Ordinance § 165.12, Plaintiff's App. at 023.

The Zoning Ordinance also contains provisions regarding nonconforming uses at the time of enactment and the abandonment of such nonconforming uses. With respect to nonconforming uses in existence at the time of enactment , the Zoning Ordinance provides:

> The lawful use of any building or land existing at the time of the enactment of the Zoning Ordinance may be continued

> although such use does not conform with the provisions of this
> chapter.

Dakota City Zoning Ordinance § 165.18, Plaintiff's App. at 029. With regard to the abandonment of such nonconforming uses, the Zoning Ordinance states:

> Whenever a nonconforming use has been discontinued for a
> period of one year, such use shall not thereafter be
> reestablished, and any future use shall be in conformity with
> the provisions of this chapter.

Dakota City Zoning Ordinance § 165.19, Plaintiff's App. at 029.

In 2000, Dakota City had a total reported population of 911 people. The United States Census Bureau report for 2000 reports that only one Native American lives in Dakota City. Dahlsten is a Native American.◾[1]

Plaintiff Dahlsten owns a Vietnamese pot-bellied pig named Sid. Dahlsten got Sid as a pet for his son, Zachary. Zachary is autistic and, as the result of being attacked by a dog, is afraid of animals that might jump up on him, such as a cat or dog. Dahlsten acquired Sid around April 11, 2004. Sid is approximately 18 inches high, 30 inches long and weighs 80 pounds. Pursuant to Dakota City Ordinance § 55.06 and Iowa Code § 717.1, Sid is classified as "livestock" because he is a porcine species. Sid spends approximately ninety-percent of his time inside. Sid is potty trained and uses a kitty litter box inside. When outside, he defecates and urinates in a specific spot. Dahlsten cleans up these spots and properly disposes of the manure.

---

[1]The court notes that because Dahlsten states in his deposition that he did not move to Dakota City until either 2001 or 2002, *see* Defendant's App. at 17, Dahlsten Dep. at 38, he cannot be the Native American resident of Dakota city referred to in the 2000 United States Census report.

On April 14, 2004, Agnes Fouarge, a resident of Dakota City, appeared before the Dakota City City Council concerning the housing of horses at her residence. Her residence is zoned residential. The minutes for that meeting read in pertinent part as follows:

> Citizen Agnes Fouarge presented a letter from some of the property owners stating they do not have a problem with her horses being kept on her property, located a [sic] 706 2nd Avenue South. She received a building permit in 2002 to place a fence on her property where her horses would be kept for short periods of time. After a complaint of the horses being there for over a week she approached the council asking for an extension because her pastureland has been recently reseeded.
>
> Motion by Fort second by Faltinson to allow horses to be there temporarily and through the summer months only while her pasture is growing and only on a temporary basic [sic]. Ayes: Faltinson, Greene, Fort. Nays: Nelson, Richard. Motion carried.

Dakota City City Council Minutes, April 14, 2004, Defendants' App. at 48.

On April 28, 2004, the Dakota City City Council held a special session to revisit its decision to permit Fouarge to house horses at her residence. The minutes of that meeting read in pertinent part that:

> This meeting was called to rescind a motion that was made at the April 14, 2004 council meeting, where under citizens, Agnes Fouarge requested having horses on her property located at 706 2nd Avenue South. Since she was not listed on the agenda no action should have been take [sic].
>
> Motion by Fort second by Faltinson to rescind the motion made at the April 14, 2004 meeting, allowing horses to be kept on her property temporarily, for short periods of time, during

> the summer months while the regular pastureland is growing, after being reseeded.  All ayes.  Motion carried.
>
> The Council felt that [sic]on the April 14, 2004 meeting they were not given all the facts and caught off guard.  She did apply for a building permit in 2002 to have a fence built with no mention of it being an electric fence or that she had intentions of horses being there for more than a few hours at a time, so she could work with them.  Safety and health issues and being in a residential zone were discusses [sic].
>
> After a lengthy discussion several motions were made and died because of no second.
>
> Motion by Richard second by Nelson to deny Agnes Fouarge from keeping horses on her property.  Ayes:  Nelson, Richard, Faltinson.  Nay:  Fort.  Motion carried.
>
> Counsel also approved to allow her two (2) weeks, from this date, to have her horses removed from her property, located at 706 2nd Avenue South.

Dakota City City Council Minutes, April 28, 2004, Defendants' App. at 51.

On May 12, 2004, the issue of the Dahlstens having a pot-bellied pig at their residence was discussed at the Dakota City City Council meeting.◘[2]  As a result, on May 13, 2004, a letter was sent from David Lee, as Mayor of Dakota City, to Frank and Kim Dahlsten which reads in pertinent part:

---

[2]How the Dakota City Council learned of Sid's presence is unclear from the summary judgment record.  Defendants assert that during the course of the April 12, 2004 Dakota City Counsel meeting, Fouarge mentioned that her neighbor, Frank Dahlsten, had a pot-bellied pig at his residence.  The council minutes for that meeting, however, do not reflect that Sid's presence in Dakota City was brought up.  In any event, it is clear that Sid's presence at the Dahlsten residence was addressed for the first time at the May 12, 2004,  Dakota City City Council meeting.

It has come to the attention of the City Council at the May
12th meeting, that you have a potbelly pig at your residence
located at 205 7th Street South in Dakota City, Iowa.  The
City Code states that you are not allowed to have pigs of any
kind within the city limits of Dakota City and are hereby
giving you until May 29th to have the pig removed from the
city.

City Code-Chapter 55.05 states that it is unlawful for a person
to keep with the City except by written consent of the Council
or except in compliance with the City's zoning regulations.

Livestock means any animal belonging in the bovine, caprine,
equine, ovine or porcine (pig) species, ostriches, rhea, and
emus, farm deer as defined in Section 170.1 of the Code of
Iowa; or poultry.  (Code of Iowa, Section 717.1)

Your property is zoned residential and therefore livestock is
not allowed.

Letter of May 13, 2004, Defendants' App. at 59.◘[3]

Dahlsten did not comply with the request to remove Sid.  On June 9, 2004, Dahlsten
appeared before the Dakota City Council to request that his family be allowed to keep Sid
within city limits.  Dahlsten's request was denied and he was given until July 1, 2004, to
remove Sid.   On July 1, 2004, Humbolt County Sheriff Dean Kruger observed that Sid
was still at the Dahlsten residence.◘[4]   As a result, Sheriff Kruger filed a municipal
infraction citation against Dahlsten for violation of Dakota City Ordinance 55.05.

_____

[3]The court notes that there is no evidence in the summary judgment record of
anyone in Dakota City ever lodging a complaint about Sid.

[4]The Humbolt County Sheriff's Office provides law enforcement for Dakota City
because Dakota City does not have a police department.

On October 27, 2004, a bench trial on Dahlsten's municipal infraction citation occurred in Iowa District Court for Humboldt County. On November 10, 2004, Dahlsten, along with his attorney, appeared before the Dakota City City Council to seek a variance which would permit Sid to stay within city limits. After discussing Dahlsten's request, the Dakota City City Council concluded that it would not alter its prior decision and would wait for a decision from the Iowa District Court regarding the outcome of Dahlsten's municipal infraction citation. On November 16, 2004, after considering arguments from defense counsel concerning the nature of Sid, the Iowa court held that Dahlsten was in violation of Dakota City Ordinance 55.05. The court held that Dahlsten had to remove Sid from his residence within 10 days and fined him $100 but suspended the fine upon the condition that Dahlsten remove Sid within 10 days. No appeal of the Iowa court's decision was taken by Dahlsten.

On March 9, 2005, Dahlsten again requested that Sid be allowed back into Dakota City. On April 13, 2005, after discussing Dahlsten's request, the Dakota City City Council again concluded that it would not alter its previous decision regarding Sid.

In January of 2006, Dahlsten returned Sid to his home in Dakota City. Dahlsten contacted the Humboldt County Sheriff and told the sheriff that Sid had contracted pneumonia. Dahlsten asked permission to treat Sid at his home. The Dakota City City Attorney gave Dahlsten permission to have Sid at his home temporarily while he was under the care of a veterinarian for the treatment of his pneumonia.

On February 1, 2006, a contempt charge was filed against Dahlsten for continuing to keep Sid at his home. On March 2, 2006, a hearing was held in Iowa District Court, Magistrate Division, on Dakota City's application to abate violation and for contempt. The Iowa court found that Sid was no longer suffering from pneumonia and that Dahlsten was in contempt of its prior order requiring Dahlsten to remove Sid from Dakota City. As a

result, the Iowa court sentenced Dahlsten to be jailed for fourteen days. The court further found that Dahlsten could purge himself of contempt by permanently removing Sid from Dakota City within 30 days. Dahlsten appealed the March 2, 2006, decision. On April 24, 2006, the Iowa District Court considering Dahlsten's appeal dismissed the contempt judgment against Dahlsten at the request of Dakota City because Dahlsten had again removed Sid from Dakota City.

On May 24, 2006, the Dakota City attorney sent a letter to Dahlsten regarding a vehicle at his residence which was in violation of Dakota City's Junk Vehicle Ordinance. This letter read as follows:

> It has been brought to my attention by the Humboldt County Sheriff's Department that you have 1 or more cars located on your property or on the property of another that are in violation of the Dakota City Junk Vehicle Ordinance. Under Dakota City ordinance, you, as the owner, must remove or repair said vehicle(s).
>
> Failure to remove or repair the vehicle(s) will be sufficient cause for the City to have the vehicles removed at your cost. Furthermore, the costs of storage will be charged against you or against your property. If you fail to remove or repair within 10 days of the date of this notice, the Humboldt County Sheriff's Department, or its designated agency will move the vehicle. The vehicle(s) will thereafter be impounded and subsequently sold or disposed of as specified in Iowa Code Chapter 321.89-321.91. The cost of abatement will be charged to you as the owner of the vehicle or as the owner of the property on which the vehicle(s) are located.
>
> You are further notified that you may request to appear before the Dakota City council by filing a written request to the Dakota City Clerk. . .within five days of the service of this notice upon you, and thereafter you shall be given an

opportunity to appear before the city council and show cause, is [sic] any, you may have, as to why said vehicle or vehicles should not be removed. The vehicle(s) is described as:

-A White 1990 Chevy Lumina, expired license plate 103NGC and is located at 205-7th Street S, Dakota City, IA 50529.

The repairs and changes that are required to make to [sic] this vehicle(s) to bring it into compliance with the Dakota City ordinances are as follows:

**The vehicle must be currently licensed and registered and made operable.**

You are hereby required by the ordinance of the City of Dakota City to take notice of the above and govern yourself accordingly.

Letter of May 24, 2006, Defendants' App. at 105. At approximately the same time that Dahlsten was sent this letter, five other residents of Dakota City were sent nearly identical letters apprising them about vehicles at their respective residences which were deemed to be in violation of Dakota City's Junk Vehicle Ordinance. Dahlsten has been contacted several times regarding junk vehicles on his property since moving to Dakota City, but he has never been given a municipal citation for having junk vehicles on his property.

On July 12, 2006, Dahlsten again appeared before the Dakota City City Council requesting that Sid be permitted to live at Dahlsten's home in Dakota City. The Dakota City City Council again denied Dahlsten's request. Dahlsten was never arrested or incarcerated for any violations of the Dakota City Ordinance.

On September 8, 2006, Dahlsten was required to pay $10.00 for a building permit

to add or make repairs to a deck on the west side of his house.  At least four other residents of Dakota City also were required to obtain building permits before constructing decks on their property within Dakota City.

 Dahlsten's home is rented from Norman Beeson and is located in Block 57 on the Dakota City Zoning map.  Dahlsten's home is zoned residential B for multiple family dwellings.  Agnes Fouarge's property at 406 Second Avenue is also located on the 57th block on the Dakota City Zoning map and is likewise zoned residential B for multiple family dwellings.

Donald Faltinson owns a home located at 410 2nd Street North in Dakota City. Faltinson's property is located on Block 97 on the Dakota City Zoning map.  Faltinson purchased the property in 1984.  Pursuant to Dakota City's zoning ordinance of 1973, the eastern most portion of Faltinson's property is zoned residential while the western half of the property is zoned heavy industrial.  All of Block 97 has been farm in which livestock has been housed continually and without interruption since the nineteenth century.

Brad Strutzenberg owns a home located at 601 1st Street North in Dakota City. Strutzenberg's property is a triangular piece of property north of the corner of Sixth Street and Sixth Avenue North in Dakota City.  Pursuant to Dakota City's zoning ordinance of 1973, Strutzenberg's property was not officially zoned.  Strutzenberg has had horses on his property since approximately 1975.  On November 8, 2006, the Dakota City City Council  passed Ordinance No. 251 which zoned Strutzenberg's property to be in a Class "C" commercial district.

David Lee owns a home located at 302 2nd Street North, Dakota City. Lee's property is located on Block 96 on the Dakota City Zoning map.  Pursuant to Dakota City's zoning ordinance of 1973, the eastern portion most portion of Lee's property is zoned residential while the western half of the property is zoned heavy industrial.   Lee

purchased the property in 1972. At the time of his purchasing the property, it was being used as a horse farm. After his purchase of the property, Lee kept horses on the property until 1998, when he removed them for a short period of time in anticipation of his moving due to a job transfer. When Lee's transfer did not occur, he returned the horses to his property and appeared before the Dakota City City Council to request a variance for his horses. Lee's request for a variance was granted.

No person has come before the Board of Adjustment seeking a variance in a zoning ordinance to allow livestock to be kept within Dakota City's city limits. Requests for such variances, however, have been made before the Dakota City City Council, including David Lee in 1998, Agnes Fouarge in 2004 and the request made by Dahlsten in 2004.

On several occasions in recent years the City of Dakota City has approached Dahlsten regarding junk vehicles being on his property. Dakota City's actions were taken pursuant to the Dakota City Junked Vehicle Ordinance. Dakota City has sent notice to a number of other individuals within Dakota City regarding junked vehicles. David Lee had a junked vehicle on his property that is zoned residential at the same time that Dahlsten was being sent notices concerning junked vehicles on his property. Lee, however, never received a notice from Dakota City regarding the junked vehicle on his property.

At one time, Dahlsten flew a flag in front of his home which depicted the Native American leader Geronimo superimposed on the American Flag. Members of the Veterans of Foreign Wars ("VFW") Women's Auxiliary Chapter complained to Sheriff Kruger of Humboldt County regarding Dahlsten's flag. Sheriff Kruger, in an attempt to diffuse tension between the VFW Women's Auxiliary Chapter and Dahlsten, approached Dahlsten and offered to give him another flag. Dahlsten declined Sheriff Kruger's offer. Sheriff Kruger allowed Dahlsten to continue to fly his flag because of his desire to do so.

Dakota City city ordinances require a building permit for building to the exterior of a house. Dahlsten and his wife were required to obtain a building permit for a deck to their home. Non-minorities have also been required to obtain a building permit for deck construction.

Within the city limits of Dakota City, there are several grass alleyways. Dakota City does not maintain these grass alleyways but they are occasionally used by individuals to access property. There have been occasions in the recent past where, due to rain, these grass alleyways have become very muddy and rutted. Dakota City has temporarily closed these grass alleyways for a period of time in order to permit them to dry out. This was done in order to prevent further rutting and to keep the alleys from becoming a dirt or mud alley. When the grass alleys were closed, they were closed to all drivers, and not just Dahlsten. The closing of the grass alleys by Dakota City had no relation to Dahlsten's request to house Sid within city limits.

## II.  LEGAL ANALYSIS

### A.  Standards For Summary Judgment

Motions for summary judgment essentially "define disputed facts and issues and . . . dispose of unmeritorious claims [or defenses]." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1982 (2007); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. . . ."). Any party may move for summary judgment regarding "all or any part" of the claims asserted in a case. Fed R. Civ. P. 56(a), (b) (allowing a claimant to move for summary judgment "at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party," and allowing a defending party to move for

summary judgment "at any time"). Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no *genuine* issue of *material* fact and that the moving party is entitled to a judgment as a matter of law." *Id.* 56(c) (emphasis added); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.").

A fact is *material* when it "'might affect the outcome of the suit under the governing law.'" *Johnson v. Crooks*, 326 F.3d 995, 1005 (8th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Thus, "the substantive law will identify which facts are material." *Anderson*, 477 U.S. at 248. Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.* An issue of material fact is *genuine* if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods*, 409 F.3d at 990 (quoting *Anderson*, 477 U.S. at 248); *see Diesel Machinery, Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 832 (8th Cir. 2005) (stating genuineness depends on "whether a reasonable jury could return a verdict for the non-moving party based on the evidence"). Evidence presented by the nonmoving party that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, such as a "scintilla of evidence," *Anderson*, 477 U.S. at 252; *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir. 1997), or evidence that is "merely colorable" or "not significantly probative," *Anderson* at 249-50, does not make an issue of material fact genuine.

Thus, a *genuine issue of material fact* is not the "mere existence of some alleged factual dispute between the parties." *State Auto. Ins. Co. v. Lawrence*, 358 F.3d 982, 985 (8th Cir. 2004). "'Instead, "the dispute must be outcome determinative under prevailing law."'" *Mosley v. City of Northwoods*, 415 F.3d 908, 910-11 (8th Cir. 2005) (quoting *Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir. 1992), in turn quoting *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989)). In other words, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49. Essentially, a genuine issue of material fact determination, and thus the availability of summary judgment, is a determination of "whether a proper jury question [is] presented." *Id.* at 249. A proper jury question is present if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

Procedurally, the moving party does not have to "support its motion with affidavits or other similar materials *negating* the opponent's claim," *Celotex*, 477 U.S. at 323, but the moving party does bear "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel,* 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Thus, a movant need only demonstrate the absence of a genuine issue of material fact and that it is entitled to judgment according to law. *See Celotex*, 477 U.S. at 323 ("[T]he motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a

genuine issue for trial." Fed. R. Civ. P. 56(e); *Mosley*, 415 F.3d at 910 ("The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995))). Thus, the movant must show the absence of a genuine issue of material fact as it relates to the substantive law, and the nonmovant must show the alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 322; *In re Temporomandibular Joint*, 113 F.3d at 1492.

In considering whether a genuine issue of material fact is present the court must view all the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88; *Mosley*, 415 F.3d at 910. Further, the court must give such party the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita*, 475 U.S. at 587-88. However, "because we view the facts in the light most favorable to the non-moving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Rather than "attempt[ing] to determine the truth of the matter . . . the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

Of course, the facts are not the sole concern of the court; after all, a genuine issue of material fact necessarily depends on the substantive law. *See Holloway*, 884 F.2d at 366 ("The presence of a genuine issue of fact is predicated on the existence of a legal theory which can be considered viable under the nonmoving party's version of the facts. The mere existence of a factual dispute is insufficient alone to bar summary judgment;

rather, the dispute must be outcome determinative under prevailing law."). Moreover, summary judgement is particularly appropriate "where the unresolved issues are primarily legal rather than factual." *Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1315 (8th Cir. 1996). But even if no genuine issue of material fact is present in a case, summary judgment is not appropriate unless the governing law supports the moving party's position. Fed. R. Civ. P. 56(c) (requiring the moving party to also show that it "is entitled to judgment as a matter of law"). Furthermore, "the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson*, 477 U.S. at 252; *see Brandon v. Lotter*, 157 F.3d 537, 539 (8th Cir. 1998) ("'In ruling on a motion for summary judgment, the court must bear in mind the actual quantum and quality of proof necessary to support liability under the applicable law.'" (quoting *Hartnagel*, 953 F.2d at 396)). Consequently, with these standards in mind, the court turns to consideration of the parties' arguments for and against summary judgment in this case.

## B. Plaintiff's Equal Protection Claim

### 1. Elements of the claim

The Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. The Equal Protection Clause "requires that the government treat all similarly situated people alike." *Barstad v. Murray County*, 420 F.3d 880, 884 (8th Cir. 2005); *see City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Stated another way, "[t]his is not a command that all persons be treated alike but, rather, 'a direction that all persons similarly situated should be treated alike.'" *Artway v. Attorney Gen. of N.J.*, 81 F.3d

1235, 1267 (3d Cir. 1996) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)); *accord Plyler v. Doe*, 457 U.S. 202, 216 (1982). Thus, the Fourteenth Amendment's Equal Protection Clause prohibits government officials from selectively applying laws in a discriminatory way motivated intentionally or purposefully by a prohibited characteristic, such as race or ethnicity. *Brandt v. Davis*, 191 F.3d 887, 893 (8th Cir. 1999); *Central Airlines, Inc. v. United States*, 138 F.3d 333, 334-35 (8th Cir. 1998). Plaintiff Dahlsten asserts that defendants unlawfully singled him out for enforcement of its zoning codes and ordinances with regard to his being able to keep Sid at his residence, while permitting non-minority individuals to house agriculture animals at their residences within the city limits of Dakota City and that defendants' actions were based on Dahlsten's status as a Native American.

To prove an equal protection claim, a plaintiff must show (1) that he or she was singled out and treated differently from persons similarly situated, and (2) that the plaintiff was singled out on the basis of a prohibited characteristic, such as race. *See Ellebracht v. Police Bd. of Metro. Police Dep't of St. Louis*, 137 F.3d 563, 566 (8th Cir. 1998). A plaintiff bears the burden of proving that he is similarly situated to those whom he compares himself to "in all relevant respects." *Carter v. Arkansas*, 392 F.3d 965, 968 (8th Cir. 2004). This court has elsewhere explained that, "[a]bsent a threshold showing that [the plaintiff] is similarly situated to those who allegedly received favorable treatment, the plaintiff does not have a viable equal protection claim." *Mummelthie v. City of Mason City*, 873 F. Supp. 1293, 1333 (N.D. Iowa 1995) (citing *Klinger v. Department of Corrections*, 31 F.3d 727, 731 (8th Cir. 1994), *cert. denied*, 513 U.S. 1185 (1995)), *aff'd*, 78 F.3d 589 (8th Cir. 1996) (table op.); *accord Arnold v. City of Columbia*, 197 F.3d 1217, 1220 (8th Cir. 1999) ("To prove their equal protection claim [based on disparate pay], appellant were required, as a threshold matter, to demonstrate that they were treated

differently from others similarly situated to them.") (emphasis in the original); *Roark v. City of Hazen,* 189 F.3d 758, 761 (8th Cir. 1999) (holding that plaintiff's equal protection claim failed, because he presented no evidence showing that he was treated in a manner different from that accorded other similarly situated individuals). "[D]issimilar treatment of dissimilarly situated persons does not violate equal protection." *Klinger*, 31 F.3d at 731; *accord Arnold*, 197 F.3d at 1221 ("'Treatment of dissimilarly situated persons in a dissimilar manner by the government does not violate the Equal Protection Clause.'") (quoting *Keevan v. Smith*, 100 F.3d 644, 648 (8th Cir.1996)). "Thus, the initial inquiry in analyzing an equal protection claim is to determine whether a person is similarly situated to those persons who allegedly received favorable treatment." *United States v. Whiton*, 48 F.3d 356, 358 (8th Cir. 1995).

### 2. Was Dahlsten "similarly situated" to others?

Defendants seek summary judgment on plaintiff Dahlsten's equal protection claim, contending, *inter alia*, that plaintiff Dahlsten's claim fails as a matter of law because Dahlsten cannot point to any similarly situated individual who has been given a variance to house agriculture animals in a residential zone. Plaintiff Dahlsten contends that he is similarly situated to three non-minority residents, Brad Strutzenberg, Ron Faltinson and defendant David Lee, the Mayor of Dakota City, each of whom own and house horses on land within the city limits of Dakota City. Thus, the court must review the summary judgment record in this case to determine whether the situation of any of these three individuals is, in fact, similarly situated to the situation of plaintiff Dahlsten. The court will consider the situations of each of these individuals *seriatim*.

### a. *The Brad Strutzenberg property*

Brad Strutzenberg owns a home located at 6011st Street North in Dakota City. Strutzenberg's property was not zoned under Dakota City's zoning ordinance of 1973. It was not until November 8, 2006, that the Dakota City City Council zoned Strutzenberg's property as a Class "C" commercial district. However, Strutzenberg has kept horses on his property since 1975. With respect to nonconforming uses in existence at the time of enactment, the Zoning Ordinance provides:

> The lawful use of any building or land existing at the time of the enactment of the Zoning Ordinance may be continued although such use does not conform with the provisions of this chapter.

Dakota City Zoning Ordinance § 165.18, Plaintiff's App. at 029. Thus, because Strutzenberg's housing of horses on his property predates the inclusion of that property within the Zoning Ordinance, Strutzenberg's housing of horses on his property was grand fathered as a permitted non-conforming use pursuant to the Zoning Ordinance. *See Perkins v. Madison County Livestock & Fair Ass'n*, 613 N.W.2d 264, 270 (Iowa 2000) (noting that under Iowa law "[a] non-conforming use is one 'that existed and was lawful when the [zoning] restriction became effective and which has continued to exist since that time.'") (quoting *Board of Supervisors v. Miller*, 170 N.W.2d 358, 360 (Iowa 1969) (internal quotation marks omitted). Dahlsten's property, in contrast, is zoned residential B for multiple family dwellings, a zoning designation under which no livestock is permitted to reside. Accordingly, the court concludes that Brad Strutzenberg cannot be considered to be similarly situated to plaintiff Dahlsten.

### b. The Ron Faltinson property

Donald Faltinson owns a home located at 410 2nd Street North in Dakota City, which he purchased in 1984. Faltinson's property is located on Block 97 on the Dakota City Zoning map. Pursuant to Dakota City's zoning ordinance of 1973, the eastern most portion of Faltinson's property is zoned residential while the western half of the property is zoned heavy industrial. All of Block 97 has been farm in which livestock has been housed continually and without interruption since the nineteenth century. Thus, like Brad Strutzenberg's property, Faltinson's housing of horses on his property is a grand fathered permissible non-conforming use. Accordingly, the court similarly concludes that Donald Faltinson cannot be considered to be similarly situated to plaintiff Dahlsten.

### c. The David Lee property

David Lee owns a home located at 302 2nd Street North, Dakota City. Pursuant to Dakota City's zoning ordinance of 1973, the eastern most portion of Lee's property is zoned residential while the western half of the property is zoned heavy industrial. When Lee purchased the property in 1972, it was being used as a horse farm. After he purchased the property, Lee continued to keep horses on the property until 1998, when he removed them for a short period of time in anticipation of his moving due to a job transfer. When Lee's transfer did not occur, he returned the horses to his property. Because Lee housed horses on his property at the time the Zoning Ordinance was enacted in 1973, the housing of horses on his property, like those of both Strutzenberg and Faltinson, is a grand fathered permissible non-conforming use. Although Lee did seek a variance after returning his horses to his property following his aborted move in 1998, such a procedure was unnecessary since under the terms of the Zoning Ordinance, a non-conforming use is not deemed abandoned until the passage of one year. Accordingly, the court finds that David Lee cannot be considered to be similarly situated to plaintiff Dahlsten. Thus, upon review

of the summary judgment record, the court concludes that none of these three individuals can be considered to be similarly situated to plaintiff Dahlsten and that, therefore, summary judgment on plaintiff Dahlsten's equal protection claim must be granted. Therefore, this portion of defendants' Motion For Summary Judgment is granted.

## C. Plaintiff's State Law Claims

### 1. Public accommodation claim

Defendants also seek summary judgment on Dahlsten's claim that defendants' conduct violated his rights under Iowa Code § 216.7 to "accommodations, advantages, facilities, services, and privileges" without regard to his race and not to be "otherwise . . . discriminate[d] against . . . because of race ... in the furnishing of such accommodations, advantages, facilities, services, or privileges." Defendants assert that they have not provided a "public accommodation" to Dahlsten and that Iowa Code § 216 is therefore inapplicable to the circumstances of this case. Dahlsten also resists summary judgment on this claim.

The Iowa Civil Rights Act (ICRA) defines unfair practices in accommodations and services, in pertinent part, as follows:

> 1.     It shall be an unfair or discriminatory practice for any owner, lessee, sublessee, proprietor, manager, or superintendent of any public accommodation or any agent or employee thereof:
>
> > a.     To refuse or deny to any person because of race, creed, color, sex, national origin, religion or disability the accommodations, advantages, facilities, services, or privileges thereof, or otherwise to discriminate against any person because of race, creed, color, sex, national origin, religion or disability in the

> furnishing of such accommodations, advantages, facilities, services, or privileges.

IOWA CODE § 216.7(1)(a). A "public accommodation" is defined in the ICRA as follows:

> 12. "Public accommodation" means each and every place, establishment, or facility of whatever kind, nature, or class that caters or offers services, facilities, or goods for a fee or charge to nonmembers of any organization or association utilizing the place, establishment, or facility, provided that any place, establishment, or facility that caters or offers services, facilities, or goods to the nonmembers gratuitously shall be deemed a public accommodation if the accommodation receives governmental support or subsidy. Public accommodation shall not mean any bona fide private club or other place, establishment, or facility which is by its nature distinctly private, except when such distinctly private place, establishment, or facility caters or offers services, facilities, or goods to the nonmembers for fee or charge or gratuitously, it shall be deemed a public accommodation during such period.
>
> "Public accommodation" includes each state and local government unit or tax-supported district of whatever kind, nature, or class that offers services, facilities, benefits, grants or goods to the public, gratuitously or otherwise. This paragraph shall not be construed by negative implication or otherwise to restrict any part or portion of the pre-existing definition of the term "public accommodation."

IOWA CODE § 216.2(12). Neither the statute nor case law, however, defines such terms as "accommodations," "advantages," "facilities," or "privileges" of such a "public accommodation" or the meaning of "otherwise to discriminate."

As this court concluded last year, in order to establish a *prima facie* claim of public accommodation race discrimination under Iowa Code § 216.7 the plaintiff must prove the following:

(1) [he] is a member of a protected class; (2) [he] sought to enjoy the accommodations, advantages, facilities, services, or privileges of a "public accommodation"; and (3) [he] did not enjoy the accommodations, advantages, facilities, services, or privileges of the "public accommodation" in that (a) [he] was refused or denied the accommodations, advantages, facilities, services, or privileges of the "public accommodation" under circumstances giving rise to an inference of discrimination, or (b) she was allowed to use the accommodations, advantages, facilities, services, or privileges of the "public accommodation," but was otherwise discriminated against in the furnishing of those accommodations, advantages, facilities, services, or privileges by being subjected to markedly hostile conduct that a reasonable person would find objectively unreasonable under circumstances giving rise to an inference of discrimination.

*Kirt v. Fashion Bug #3253, Inc.*, 479 F. Supp.2d 938, 963 (N.D. Iowa 2007).

With respect to Dahlsten's *prima facie* case, there is no dispute that Dahlsten satisfies the first element of his *prima facie* case, because as a Native American, he is a member of a protected class. Rather the dispute in this case centers on the second element, whether Dahlsten can show that he attempted to enjoy the accommodations, advantages, facilities, services or privileges of a public accommodation. Defendants argue that they were not providing a public accommodation in this case because Dakota City was not providing Dahlsten with his housing but was merely enforcing a zoning regulation with respect to Dahlsten's privately owned residence. Dahlsten responds that the streets and alleyways of Dakota City constitute public accommodations under the ICRA and that he should be entitled to walk Sid on the streets of Dakota City in the same manner as Faltinson, Lee, and Strutzenberg are able to walk their horses. The flaw in this argument is that the court is aware of nothing which would prevent Dahlsten from using the public accommodations of Dakota City's streets and alleyways to take Sid for a walk within

Dakota City. Rather, what Dahlsten is currently being prevented from doing is housing Sid at his private residence. Thus, the issue boils down to whether Dahlsten's own private residence constitutes a "public accommodation" under the ICRA. The IRCA's definition of public accommodation specifically excludes "other place[s]" or "facilit[ies] which are by their "nature distinctly private". IOWA CODE § 216.2(12). The court would be hard pressed to think of any place which by its nature is more "distinctively private" than a personal residence. Moreover, there is nothing in the summary judgment record which would even suggest that Dahlsten's residence is otherwise. As a result, the court concludes that Dahlsten's residence does not constitute a public accommodation under the ICRA and that Dahlsten has not established a *prima facie* case of public accommodation race discrimination under the ICRA. Therefore, the court concludes that defendants are entitled to summary judgment on this claim as well and this portion of defendants' Motion For Summary Judgment is also granted.

### 2. *Retaliation claim*

Finally, defendants also seek summary judgment on Dahlsten's claim that defendants' retaliated against him in violation of the ICRA after he requested permission to house Sid at his residence. Defendants argue that Dahlsten's retaliation claim fails as a matter of law because Dahlsten is unable to show a causal connection between his exercise of a constitutionally protected right and the adverse actions taken against him. Alternatively, defendants assert that Dahlsten's retaliation claim fails because there were legitimate, non-discriminatory reasons for the actions taken against Dahlsten.

Here, Dahlsten alleges in his complaint that: "Defendants' actions were taken against plaintiff as a direct cause of his acting as an advocate for himself and his family with respect to Sid." Compl. at ¶ 38. He further alleges that defendants took the following retaliatory actions against him: first, enforcing an ordinance against "junked"

cars by sending a notice with respect to a vehicle at Dahlsten's residence while permitting other individuals to keep similar vehicles at their residences without being sent such a notice; second, requiring him to obtain a building permit to build a deck onto his home, while not requiring non-minorities to obtain building permits for decks added to their residences; and, third, that defendants have blocked a public alleyway in order to preclude him from driving on that public alleyway.

Section 8 of the Iowa Civil Rights Act of 1965, as amended, makes it an "unfair or discriminatory practice" for:

> Any person to discriminate or retaliate against another person in any of the rights protected against discrimination by this chapter because such person has lawfully opposed any practice forbidden under this chapter, obeys the provisions of this chapter, or has filed a complaint, testified, or assisted in any proceeding under this chapter.

IOWA CODE § 216.11(2).

Because the ICRA is in part modeled after Title VII, Iowa courts have traditionally looked to federal law for guidance in interpreting it. *See Pecenka v. Fareway Stores, Inc.*, 672 N.W.2d 800, 803 (Iowa 2003); *see also Boyle v. Alum-Line, Inc.*, 710 N.W.2d 741, 750 (Iowa 2006); *Estate of Harris v. Papa John's Pizza*, 679 N.W.2d 673, 678 (Iowa 2004); *Channon v. United Parcel Service, Inc.*, 629 N.W.2d 835, 861-62 (Iowa 2001); *Lynch v. City of Des Moines*, 454 N.W.2d 827, 833 n.5 (Iowa 1999). Here, neither party has argued that the court should apply a different analysis to the ICRA. Therefore, the court declines to forge new ground in the absence of such a request or briefing to support such a sojourn and shall apply the familiar burden-shifting analysis established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Thus, to establish a *prima facie* case of retaliation, Dahlsten must show that (1) he engaged

in a protected activity; (2) the defendant subjected him to a materially adverse action; and (3) a causal link exists between the protected activity and the materially adverse action. If Dahlsten presents a *prima facie* retaliation claim, the burden shifts to defendants to articulate a legitimate nondiscriminatory reason for their actions. If defendants articulate such a reason, Dahlsten bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory motive. *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2414-15 (2006); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); *McDonnell Douglas*, 411 U.S. at 802.

In seeking summary judgment against Dahlsten on this claim, defendants first assert that Dahlsten has failed to create a genuine issue of material fact regarding whether he engaged in a protected activity. Iowa Code § 216.8A(3)(c)(2) provides that the following circumstance constitutes "discrimination" under the ICRA:

> A refusal to make reasonable accommodations in rules, policies, practices, or services, when the accommodations are necessary to afford the person equal opportunity to use and enjoy a dwelling.

IOWA CODE § 216.8A(3)(c)(2). Viewing the facts in the summary judgment record in the light most favorable to Dahlsten, the court concludes that when Dahlsten appeared before the Dakota City City Council to seek permission to keep Sid at his residence, he was seeking an accommodation in accord with that required by Iowa Code § 216.8A(3)c)(2). Thus, the court concludes that Dahlsten has generated a genuine issue of material fact as to whether he was engaged in an activity protected by the ICRA.

The parties have not discussed the second prong of the retaliation *prima facie* test, but have instead focused their attention on the causal connection requirement. Dahlsten's primary argument appears to be that the temporal proximity between his protected conduct and the materially adverse actions is legally sufficient to establish causation. The Eighth

31

Circuit Court of Appeals has noted that the burden of causation "could conceivably" be met by showing close temporal proximity between the statutorily protected activity and the materially adverse action. *Zhuang v. Datacard Corp.*, 414 F.3d 849, 856 (8th Cir. 2005); *see also  Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004); *Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791, 798-99 (11th Cir. 2000).  But mere temporal proximity, without more, must be "very close."  *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273  (2001) (internal citations omitted).

Here, in opposing summary judgment, the court concludes that Dahlsten has failed to present evidence from which a reasonable jury could find any causal connection between his request on June 9, 2004, that he be permitted to keep Sid at his residence and defendants' alleged adverse actions against him.  First, with respect to his receiving notices regarding junked vehicles at his residence, the record is clear that Dahlsten was originally contacted about keeping junked vehicles at his residence prior to Sid's arrival and that this conflict has been an ongoing situation.  The last such notice in the summary judgment record is dated May 24, 2006, almost two years after Dahlsten's original request to keep Sid at his residence.  This 23 month period, without more, does not rise to the level of "very close."  *See Clark County Sch. Dist.*, 532 U.S. at 273; *see also Hesse v. Avis Rent A Car System, Inc.*, 394 F.3d 624, 633 (8th Cir. 2005) (holding plaintiff in Title VII sexual discrimination claim failed to show a causal link where nearly two years passed between her complaints and her termination); *Gagnon v. Sprint Corp.*, 284 F.3d 839, 851-52 (8th Cir. 2002) (noting that a one-month lapse between the protected activity and the retaliatory act was insufficient to support a causal link); *Sowell v. Alumina Ceramics, Inc.*, 251 F.3d 678, 685 (8th Cir. 2001) ("[T]he seven-month time lapse between the protected activity and the alleged retaliatory act is, without more, too long for the incidents to be temporally-and therefore causally-related.").  Accordingly, with respect to the junked

vehicle notice being sent to Dahlsten, in the absence of other evidence tending to show causation, the substantial delay between Dahlsten's protected activity and the adverse action, this allegation of retaliation fails as a matter of law.

Dahlsten's allegation regarding Dakota City's requiring him to obtain a building permit fails on similar grounds. Dahlsten was required to get a building permit for the construction of or repairs to a deck on the west side of his home on September 8, 2006, over two years since his original appearance before the Dakota City City Council to seek permission to keep Sid at his residence. Although Dahlsten asserts that not all residents of Dakota City obtained the necessary building permits for modifications to their homes, the summary judgment record shows that at least seven residents of Dakota City did obtain building permits for the construction of decks during the summer of 2006. The fact that Dahlsten was able to find possible examples of individuals not obtaining a building permit for construction done at some unknown time in the past is hardly compelling evidence of retaliatory actions where he has made no showing that the actions of these scofflaws were either known and or approved by officials in authority in Dakota City. Therefore, with respect to Dahlsten having to obtain a building permit, in the absence of other evidence tending to show causation, the substantial delay between Dahlsten's protected activity and his adverse action, this allegation of retaliation fails as a matter of law.

Finally, with respect to Dahlsten's assertion that defendant Lee authorized a barricade of a public alleyway in order to prevent Dahlsten from using the alleyway, the summary judgment record does not support such an allegation nor does it even give rise to a genuine issue of material fact. The uncontested summary judgment record is that, following a storm which generated debris, defendant Lee told a resident that he could place storm debris that he had collected "near" the alleyway for pick up by the city. To the

extent that Lee did authorize the closing of all dirt alleyways following rain storms in order to permit them to dry, such an action does not give rise to an inference of retaliation since such actions prevented all members of the public from using the alleyways and not just Dahlsten. Therefore, with respect to the obstruction of public alleyways in Dakota City, this allegation of retaliation, too, fails as a matter of law.

The court concludes that because Dahlsten has offered no credible proof of a connection between Dahlsten's protected activity and the alleged adverse actions, he cannot make out a *prima facie* case of retaliation. Therefore, summary judgment is proper on this issue too and this portion of defendants' Motion For Summary Judgment is also granted.

The court feels compelled to note that although it has concluded that Dakota City's actions in denying Dahlsten a variance to keep his son's beloved pet, Sid, at his residence does not rise to a constitutional violation under the circumstances of this case, the wisdom of this decision is not above scrutiny. Defendants' actions in this case bring to mind Justice Thurgood Marshall's astute observation that "[t]he Constitution does not prohibit legislatures from enacting stupid laws." *New York State Bd. of Elections v. Torres*, --- S. Ct. ---, 2008 WL 140755, at *9 (Jan. 16, 2008) (Stevens, J., concurring). The decision to deny a special-needs child his pet under such circumstances strikes the court as one utterly devoid of humanitarian compassion and imbued instead by a mean-spirited devotion to conformity. Only fidelity to autocratic rule can explain the logic behind such a decision where there is no record of any complaint regarding Sid. Other than his species, one is hard pressed to distinguish, in any meaningful way, Sid from those animals who are readily and fully accepted as pets. Indeed, Sid is smaller than many breeds of dog and is house trained to use a litter box. The soundness of Dakota City's decision to exclude Sid from its borders is one which calls out for compassionate reconsideration.

### III.  CONCLUSION

For the reasons discussed above, defendants' Motion For Summary Judgment is granted in its entirety and this case is dismissed.

**IT IS SO ORDERED.**

**DATED** this 23rd day of January, 2008.

_____
MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA